**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| JUAN A. HERNÁNDEZ SÁNCHEZ, YANIRA HERNÁNDEZ SÁNCHEZ, JENNIFER HERNÁNDEZ SÁNCHEZ, MIGNA L. SÁNCHEZ GARCÍA<br><br>Plaintiffs,<br><br>v.<br><br>HOSPITAL SAN CRISTÓBAL, alternatively, UNKNOWN CORPORATION "A", d/b/a HOSPITAL SAN CRISTÓBAL; DR. JOSÉ A. CEBOLLERO MARCUCCI, personally and on behalf of his Conjugal Partnership; JOHN DOE 1, 2 and 3, personally and on behalf of their respective Conjugal Partnerships, if applicable; INSURANCE COMPANIES A, B, C, D and E,<br><br>Defendants. | CIVIL NO.: 22-cv-01656<br><br>PLAINTIFFS DEMAND TRIAL BY JURY |

**COMPLAINT**

**TO THE HONORABLE COURT:**

Plaintiffs, through her undersigned attorney, respectfully state and pray as follows:

**Jurisdiction and Venue**

1. The events and omissions giving rise to the claims set forth in this action all occurred within the District of Puerto Rico and the Commonwealth of Puerto Rico.

2. Federal jurisdiction in this case is attained under 28 U.S.C. §1331. This case is a suit arising out of violations to the Emergency Medical Treatment and Labor Act ("EMTALA"), 42 U.S.C. §1395dd. Venue is appropriate in this judicial district pursuant to 28 U.S.C. §1391(b).

3. In the alternative, federal jurisdiction in this case is attained under

-1-

diversity pursuant to 28 U.S.C. §1332. The matter in controversy exceeds, exclusive of interest and costs, the sum of $75,000.

    4.    Supplemental jurisdiction is invoked pursuant to 28 U.S.C. § 1367 for claims brought pursuant to 31 L.P.R.A. §§ 10801, 10803, 10805 and 10806 of the Laws of Puerto Rico, statutes in effect at the time of the events that give rise to this complaint.

### Parties

    5.    Plaintiff, **Mr. Juan A. Hernández Sánchez** ("Mr. Hernández Sánchez") is domiciled in the state of Florida, where he is a permanent resident. Plaintiff is an adult son and heir of Mr. Juan F. Hernández Torres ("Mr. Hernández Torres"), deceased. Mr. Juan A. Hernández Sánchez is a citizen and resident of the state of Florida. Mr. Hernández Sánchez herein asserts claims for damages against codefendant, **Hospital San Cristóbal,** alternatively, Unknown Corporation "A", d/b/a Hospital San Cristobal, under the dispositions of 42 U.S.C. §1395dd (EMTALA); and against all of the named codefendants, pursuant to 31 L.P.R.A. §§ 10801, 10803, 10805 and 10806 of the Laws of Puerto Rico.

    6.    Plaintiff, **Mrs. Yanira Hernández Sánchez** ("Mrs. Yanira Hernández") is a citizen and resident of the Commonwealth of Puerto Rico. Mrs. Yanira Hernández is an adult daughter and heir of Mr. Hernández Torres, deceased. Mrs. Yanira Hernández herein asserts claims for damages against codefendant, **Hospital San Cristóbal,** alternatively, Unknown Corporation "A", d/b/a Hospital San Cristobal, under the dispositions of 42 U.S.C. §1395dd (EMTALA); and against all of the named codefendants, pursuant to 31 L.P.R.A. §§ 10801, 10803, 10805 and 10806 of the Laws of Puerto Rico.

    7.    Plaintiff, **Mrs. Jennifer Hernández Sánchez** ("Mrs. Jennifer Hernández") is a citizen and resident of the Commonwealth of Puerto Rico. Mrs. Jennifer Hernández is an adult daughter and heir of Mr. Hernández Torres, deceased. Mrs. Jennifer Hernández herein asserts claims for damages against codefendant, **Hospital San Cristóbal,**

alternatively, Unknown Corporation "A", d/b/a Hospital San Cristobal, under the dispositions of 42 U.S.C. §1395dd (EMTALA); and against all of the named codefendants, pursuant to 31 L.P.R.A. §§ 10801, 10803, 10805 and 10806 of the Laws of Puerto Rico.

8. Plaintiff, **Mrs. Migna L. Sánchez García** ("Mrs. Migna Sánchez") is a citizen and resident of the Commonwealth of Puerto Rico. Mrs. Jennifer Hernández is widow and heir of Mr. Hernández Torres, deceased. Mrs. Migna Sánchez herein asserts claims for damages against codefendant, **Hospital San Cristóbal,** alternatively, Unknown Corporation "A", d/b/a Hospital San Cristobal, under the dispositions of 42 U.S.C. §1395dd (EMTALA); and against all of the named codefendants, pursuant to 31 L.P.R.A. §§ 10801, 10803, 10805 and 10806 of the Laws of Puerto Rico.

9. Codefendant, **Hospital San Cristóbal,** alternatively, Unknown Corporation "A", d/b/a Hospital San Cristobal, (hereinafter also referred to as the "Hospital") is, by information and belief, a corporation organized under the laws of the Commonwealth of Puerto Rico, which has its principal place of business in Puerto Rico and is the owner and/or operator of a hospital known as Hospital San Cristóbal, in Ponce, Puerto Rico.

10. Codefendant, **Dr. José A. Cebollero Marcucci** (hereinafter also referred to as, "Dr. Cebollero") is, by information and belief, a doctor in medicine, with a specialization in surgery, who on the dates relevant to the present complaint practiced his profession in Puerto Rico, at Hospital San Cristóbal, and was employed by codefendant, Hospital San Cristobal, and/or had medical privileges at Hospital San Cristobal. Dr. Cebollero incurred in negligent acts and omissions for which he and his conjugal partnership are responsible to Plaintiffs for the damages claimed in this complaint.

11. **John Doe 1, 2 and 3**, codefendants whose names are unknown, are physicians, nurses or other persons or entities that provided medical treatment to Mr.

Hernández Torres at Hospital San Cristóbal in Ponce, who incurred in negligent actions or omissions which caused or contributed to the damages claimed herein.

12. Codefendants, **Unknown Insurance Companies A through E**, insurers whose identities are presently unknown, insured the aforementioned defendants and are jointly responsible with their respective insureds for the damages claimed herein pursuant to section 2003 of Title 26 of the Annotated Laws of Puerto Rico.

### Factual Allegations

13. At the time of the incidents that give rise to the present complaint, Mr. Juan F. Hernandez Torres (hereinafter also referred to as "Mr. Hernandez Torres", or "the patient"), was a 68-year-old man, with a past medical history of diabetes mellitus, without cardiovascular or renal diseases.

14. On November 6, 2020, a CT scan of the abdomen and pelvis with IV contrast, performed on Mr. Hernandez Torres showed a distal esophagus mass consistent with cancer. There were no lymphadenopathies to suspect metastasis.

15. On December 29, 2020, Mr. Hernández Torres was admitted to the Hospital for placement of a flexible feeding tube through the abdominal wall into the stomach by means of a PEG, which is a percutaneous endoscopic gastrostomy procedure.

16. The PEG risk of death was low because the patient's diseases were controlled. The informed consent form for the PEG procedure included as potential complications the following: perforation of abdominal or chest organs, bleeding, infections (peritonitis) and abscess formation.

17. This procedure was performed by Dr. Nelson Medina, who documented no complications in his operative report. After the PEG, the patient was discharged home.

18. The following day, on December 30, 2020, a nurse from the Hospital called

Ms. Yanira Hernández, the patient's daughter, to inquire about Mr. Hernández's condition. Ms. Yanira Hernández told the nurse that her father had told her that he felt a lot of pain and discomfort, to which the nurse responded that this was normal, since something had been put in his body that did not belong to him. Due to the nurse's indications, Mr. Hernández Torres and his family thought that the pain he was feeling was normal.

19. Two days later, on January 1, 2021, Mr. Hernández Torres was taken by his daughter to the Emergency Room of the Hospital for severe abdominal pain (10/10 on pain scale) and vomiting.

20. Mr. Hernández Torres arrived at the Hospital's Emergency Room (ER) at 11:20 am of January 1, 2021, and was seen by the *Triage* nurse who documented normal vital signs for the patient and a chief complaint of abdominal pain.

21. At 12:05 pm, the attending Emergency Room physician, Dr. Javier Lillo Pérez, ordered laboratory tests and an abdominal and pelvic CT, scan without contrast, for Mr. Hernández Pérez. He also ordered morphine and that the patient be placed under observation. However, Dr. Lillo Pérez did not order the administration of intravenous (IV) fluids for the patient.

22. At 12:10 pm, an ER nurse recorded the placement of a heparin block in the patient's left arm.

23. At 2:21 p.m., Dr. Lillo Perez, recorded the history of present illness as 68-year-old male, status post PEG placement, who was brought today to the emergency department with generalized abdominal pain associated to distension and vomiting. The pertinent physical examination findings were abdominal tenderness and distension.

24. As surmised from the above, Dr. Lillo ordered diagnostic and therapeutic orders before gathering the history of present illness.

25. The standard of practice of emergency medicine is defined by a Clinical

Evaluative Process, which implies performing and recording a history of present illness, a physical examination focused on the symptoms and signs, and arriving to an impression diagnosis or differential diagnoses.

26. Dr. Lillo inverted such process as he ordered tests before his conclusive impression diagnosis, therefore, by the time he ordered the laboratory tests he did not know the probable condition Mr. Hernandez had.

27. The Clinical Evaluative Process requires that the selection of the ancillary services to confirm or rule out any emergency condition must be done according to the impression diagnosis, which is reached after complying with Clinical Evaluative Process.

28. Not complying with the Clinical Evaluative Process leads to erratic diagnoses, to failure to consider differential diagnoses, and to missing of failing to identify the actual condition of a patient.

29. Furthermore, Dr. Lillo failed to interpretate the renal function tests results within the patient's clinical condition and to correlate them with the history of present illness.

30. Dr. Lillo failed to order IV fluids to Mr. Hernandez, to restore the volemia, reverse the renal parameters impairment, and reverse the ATN which by that time were reversable.  In fact, no IV fluids were ordered by Dr. Lillo.  This omission was the beginning of serial errors at the Hospital's ER in correcting the volemia which resulted in an irreversible renal failure that required hemodialysis (for resulting end stage renal disease) and contributed to the patient's demise.

31. Dr. Lillo left his shift and let his patient dehydrated with a catastrophic intraabdominal infection without antibiotic treatment. He did not record a hand-off progress note indicating the current clinical management plan for the patient.

32. Dr. Lillo had a precious opportunity to aggressively hydrate Mr. Hernández

Torres, reverse the renal function impairment, provide immediate antibiotic coverage, and to call the on-call surgeon right away given that Mr. Hernandez Torres had absolute indications to be evaluated by a surgeon due to his clinical presentation of an acute surgical abdomen.

33. That same day, at 4:51 pm, Dr. Jose Torres Ramirez, Emergency Room physician, ordered more morphine for pain, which was administered at 5:29 pm.

34. Importantly, at 7:33 p.m., Dr. Torres Ramirez recorded an assessment note indicating that Mr. Hernández's case was consulted to the radiologist and to the on-call surgeon, codefendant Dr. Cebollero, for a possible intestinal perforation.

35. In fact, Dr. Torres Ramirez informed the patient and his daughter that he suspected that Mr. Hernández Torres was suffering from internal bleeding, **with possible sepsis**.

36. Once a medical or surgical emergency is determined, the emergency physician must provide an appropriate stabilization. The stabilization process can be achieved with the assistance of a consultant who must come to the Hospital to help the emergency physician to stabilize the patient.

37. The consulted specialists agreed on the need to perform another CT scan on the patient, this time with water solution contrast. The patient and his daughter were informed about the plan and accept it. By 9:01 p.m., the CT scan was completed.

38. At 9:46 pm, Dr. Torres Ramirez recorded an admission and disposition note, indicating that the case was presented to the surgeon, Dr. Cebollero, who provided the medical orders for the patient's admission. The admission diagnosis was **perforated viscera** (perforated hollow viscus).

39. Of note, the morbidity and mortality of hollow viscus perforation are significant in all cases, given the possibility of progression to peritonitis and its resultant

complications.

40. The stabilization of a hollow viscus perforation is an exploratory laparotomy, resection of the perforated bowel, and ileostomy/colostomy or anastomosis. In this case, the surgeon was obliged to come to the hospital in a timely fashion to provide stabilization for Mr. Hernandez's disease.

41. At 9:50 p.m., Dr. Torres Ramirez recorded the admission medical orders and stated that the condition of Mr. Hernandez was **of care**.

42. At that time, Dr. Torres Ramirez also ordered NPO (nothing by mouth), IV fluids Ringer's lactate at a rate of 60 ml/hour and the antibiotic Zosyn®. He also ordered to schedule Mr. Hernandez to the operating room and to obtain the surgery permission. He stated to notify Dr. Cebollero of the patient's arrival to the surgery ward.

43. According to the medical record, the patient had a distended abdomen and was admitted with a diagnosis of **septic shock** and **perforated viscus**, **post gastrostomy** ("On evaluation patient admitted due to Septic Shock and Hollow Viscus. ...").

44. Emergency physicians do not have admitting privileges. The usual and accepted standard of care is to place a consultation to a specialist who would then admit the patient. This is to write the order of the consult, record a brief history and indications for consulting the specialist in the consult form, and the notification of the consult to the on-call physician with date and time.

45. During the case presentation to the consultant there must be a reliable, complete, and comprehensive clinical information interchange between physicians, from which an appropriate immediate clinical management plan must arise.

46. Per the standard of care for consultations, Dr. Cebollero was obliged to come to the hospital, personally evaluate Mr. Hernández, and make his own clinical judgment as a surgeon.

47. Additionally, the Emergency Medical Treatment and Active Labor Act (EMTALA) requires that a consulted specialist come to the hospital in a timely fashion once a consultation is notified.

48. Nevertheless, Dr. Cebollero failed to come to the hospital and personally evaluate the patient upon being consulted by Dr. Torres. As such, Dr. Torres and Dr. Cebollero breached the Act by irregularly admitting Mr. Hernández Torres to the Hospital.

49. Consequently, Dr. Cebollero failed to realize that the patient was severely dehydrated to the point of renal impairment, had bandemia compatible with sepsis and should have been rushed to the operating room, the only way the patient's emergency condition could have been stabilized.

50. By Dr. Cebollero relying on the information provided by phone by Dr. Torres, he denied Mr. Hernandez Torres the only opportunity he had to survive through a timely surgical intervention.

51. The above referenced medical admission order recorded by Dr. Torres Ramirez also indicated that the patient be placed NPO (nothing by mouth), an ordered intravenous fluids at a rate of 60 ml/hour and the antibiotic Zosyn.

52. Dr. Torres Ramirez also ordered Mr. Hernández Torres to be scheduled to the operating room and to obtain permission for surgery. In said note, Dr. Torres Ramirez indicated that the surgeon, codefendant Dr. Cebollero, be notified of the patient's arrival to the surgery ward.

53. Thus, on January 2, 2021, at 2:49 am, Mr. Hernández Torres' chemistry laboratory tests showed that the BUN increased to 29.0 mg/dL and the creatinine increased to 1.91 mg/DL, while eGFR remained below normal limits. Sodium and chloride electrolytes remained low, bilirubin level increased and the albumin level became low.

54. From 4:17 am to 4:31 am, the surgery ward nurse recorded receiving Mr.

Hernández Torres with a distended abdomen and doing the admission process.

55.     Subsequently, at 6:22 am, an intern physician, Dr. Yara Cruz Santiago, evaluated Mr. Hernández Torres and recorded that Mr. Hernández looked acutely ill. She described the patient's abdomen as distended, with decreased bowel sounds, tender to deep and superficial palpation, with clean dressings over the gastrostomy tube and guarding, which is a sign of peritonitis.

56.     Peritonitis is an inflammation of the peritoneum, the tissue that lines the inner wall of the abdomen and covers and supports most of the abdominal organs. Peritonitis is usually caused by infection from bacteria or fungi. Left untreated, peritonitis can rapidly spread into the blood (sepsis) and to other organs, resulting in multiple organ failure and death.

57.     That same morning of January 2, 2021, at 9:10 a.m., Dr. Cebollero finally went to evaluate the patient, **informing him and his daughter that he could not operate Mr. Hernández Torres until additional studies were done**.

58.     At that time, Dr. Cebollero placed orders to put on hold the surgery, for IV fluids Ringer's lactate at a rate of 150 ml/hour, for an internal medicine consultation, and to place the gastrostomy tube to gravity for drainage.

59.     Distressed and worried, Ms. Yanira Hernández asked Dr. Cebollero how it was possible that he would not perform an exploratory surgery on his father immediately, if what was suspected was that he had internal bleeding with possible sepsis.

60.     In turn, according to Mrs. Yanira Hernández, her father, upset and desperate because of the pain he was experiencing and almost unable to speak, told Dr. Cebollero: "Don't you understand that I am going to die, I am going to die because I can no longer stand this pain, take away what I have here (touching his abdomen), take this away because I can no longer stand it, I feel like I am going to explode".

61.     Dr. Cebollero, seeing the patient so desperate, ordered that he be drained

through the gastrostomy tube he already had. According to Ms. Yanira Hernández, the fluid drained from her father looked very greenish, tending to a brownish color, and the amount they drained was 500cc, on two consecutive occasions, which then decreased.

62. Mr. Hernández Torres expressed that he felt a little relief only for a moment. After almost two and a half hours the pain intensified greatly, and the patient experienced tachycardia and elevations in his potassium level.

63. According to Mr. Hernández Torres' medical records at the Hospital, the patient finally underwent exploratory surgery on January 2, 2021. Dr. Cebollero documented that he began the surgery at 3:45 pm and finished at 5:40 pm.

64. After said exploratory surgery, the patient was transferred to the Intensive Care Unit of the Hospital.

65. Dr. Cebollero informed Mrs. Yanira Hernández that her father had tolerated the surgery, that he was intubated and was transferred to the ICU, that he had corrected everything that was wrong, and that there was indeed a laceration in the area where the gastrostomy had been performed. Dr. Cebollero further indicated that he found that internally **the patient's entire abdomen was covered with pus**. According to the medical record 1,000 ml of pus was found. In addition, Dr. Cebollero indicated to Ms. Yanira Hernández that all of Mr. Hernández's organs were very compromised.

66. The pathology report indicates that the postoperative diagnosis was "Intraperitoneal Abscess, **Necrotizing Infection of the Abdominal Wall**, Periappend, Liver Cirrhosis, Peristomal Link".

67. After the surgery, at about 7:40 pm, serologic test results showed BUN at 34 mg/dL, creatinine 2.56 mg/ dL and eGFR 25.11 ml/hr. Sodium and chloride electrolytes were still below normal limits. The internal medicine service was consulted due to electrolyte disturbances.

68. Dr. Cebollero consulted the pulmonologist, Dr. Bermúdez, for the management of a mechanical ventilator and his recommendations. The pulmonologist diagnosed acute respiratory failure, sepsis, ordered a chest x-ray and additional laboratory tests.

69. Similarly, an infectious disease specialist, Dr. Lugo, was also consulted. Dr. Lugo answered the consultation that same night and ordered more antibiotics and inflammation marker tests (CRP), which came back elevated.

70. At 8:10 p.m., vital signs were recorded as Blood Pressure of 101/59 mmHg and a Pulse of 136/bpm. Later that night, Dr. Cebollero consulted Dr. Ortiz Heredia, nephrologist, because of acute kidney injury (AKI) and septic shock.

71. Subsequently, Mr. Hernández Torres' clinical condition continued to worsen. New electrolyte disturbances occurred, chest radiographic signs worsened, he had several glucose disturbances, his neurological function deteriorated, and new cardiac arrhythmias were identified. Mr. Hernández Torres suffered renal failure, respiratory failure and, finally, cardiorespiratory failure.

72. According to the Death Certificate certified by Dr. Cebollero, Mr. Hernández Torres died at the Hospital on January 6, 2021, at 9:30 am. Dr. Cebollero documented that the immediate cause of death was Intraperitoneal Abscess, and that the conditions leading to said immediate cause of death were: Abdominal Wall Infection, Post Gastrostomy and Esophageal Cancer.

73. Mr. Hernández Torres suffered extensive and serious damages to his health due to the professional negligence of Hospital San Cristobal and its medical and nursing personnel, who failed to provide an appropriate medical screening examination and the necessary stabilizing treatment, to comply with the applicable norms of medical and nursing care, and to act with the reasonable prudence and attention that the

circumstances demanded in the treatment of such a patient.

74. The Emergency Medical Treatment and Labor Act, 42 U.S.C.A. §1395dd ("EMTALA"), requires from a hospital that has a hospital emergency department, that if any individual comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, in order to determine whether or not an emergency medical condition exists.

75. EMTALA's definition of emergency medical condition includes anything that is a danger to the health and safety of the patient, or that may result in impairment of any body part or function, if not treated promptly.

76. Further, EMTALA requires that if any individual comes to a hospital and the hospital determines that the individual has an emergency medical condition, (1) the hospital must provide either for such further medical examination and such treatment as may be required, within the staff and facilities available at the hospital, to stabilize the medical condition, or (2) transfer the individual to another medical facility if based upon the information available at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual.

77. Despite clear symptoms upon arrival at the Hospital's ER, along with the documented history of present illness and the laboratory test results available around 1:00 p.m. on January 1, 2021, which warranted an early surgical consultation with an impression diagnosis of an acute surgical abdomen and the absolute indication for an exploratory laparotomy, Mr. Hernández Torres was not provided an appropriate medical screening

examination within the capability of the Hospital's emergency department in order to determine whether or not an emergency medical condition existed, which required admission or transfer for stabilization and treatment.

78. Instead, Mr. Hernández Torres was left at the ER for hours without having been adequately evaluated and stabilized, all of which constitutes gross negligence and a failure by the Hospital's medical and nursing staff to comply with the dispositions mandated by the EMTALA statute.

79. Mr. Hernández Torres's death was premature and entirely avoidable considering the symptoms and conditions he presented at the Hospital on January 1, 2021, and the established medical protocols and means for their execution available to his treating physicians at said health care facility.

80. Because of the negligence in the medical care and treatment provided to the patient at the Hospital, Mr. Hernández Torres became critically ill and developed multiple preventable life-threatening processes that ultimately culminate in his untimely death.

81. More specifically, the codefendants' deviations from the medical standards and/or professional negligence include, but are not limited to: failure to act immediately in order to submit the patient to exploratory surgery in order to stabilize his condition, given the obvious health indications presented by Mr. Hernández upon arrival to the ER; failure to correctly interpret the patient's renal function test results, considering Mr. Hernández Torrres' history; failure to order intravenous fluids to Mr. Hernández Torres to restore the volemia; failure to reverse the deterioration of renal parameters; failure to timely recognize and correct abnormal chemistry test results demonstrating hypernatremia and hypochloremia dehydration resulting in an elevated BUN level; failure to promptly and timely treat Mr. Hernández's bacterial infections, considering Mr. Hernández's immunological condition; failure to assess the hematology report compatible with an acute

surgical abdomen, along with abdominal pain and distension; failure to comply with the Clinical Evaluative Process prescribed by the standard of practice of medicine by ordering diagnostic and therapeutic tests before verifying the patient's history; failure to identify the patient's condition in a timely manner; ignoring that renal failure existed in a patient with no prior history of renal disease; failure to recognize that the etiology of the patient's abdominal pain was infectious in nature; failure to properly evaluate the patient according to the standard of medical practice; as well as any other aspect of negligence that is presently unknown and that may subsequently arise from discovery.

82. The damages suffered by Mr. Hernández Torres, and by the plaintiffs in this case, were caused by the professional negligence of the Hospital and its medical, nursing and administrative staff, who did not comply with the required standards of medical care, nor did they exercise the necessary diligence and reasonable caution in the medical care provided to Mr. Juan F. Hernández Torres.

83. As a consequence of codefendants' negligence Mr. Hernández Torres experienced physical pain and suffering, emotional stress and mental anguish which were entirely avoidable given his known conditions and the established medical standards, protocols and means available to the defendants.

84. Plaintiffs, Mr. Juan A. Hernández Sánchez, Mrs. Yanira Hernández Sánchez, Mrs. Jennifer Hernández Sánchez and Mrs. Migna L. Sánchez García, who remained with Mr. Hernández Torres at the Hospital throughout his course thereat, were consumed by preoccupation and anguish as they saw and perceived Mr. Hernández Torres's own suffering and anxiety. Plaintiffs witnessed Mr. Hernández Torres rapid deterioration and eventual death.

85. Plaintiffs have lost their father and husband, respectively, an irreplaceable part of their lives. This loss has caused great emotional damage to Plaintiffs, which

continues to this day. As a consequence of the foregoing, the family, social and psychological life of Plaintiffs has been severely altered, having been deprived of the love, support, advice, care, company, and attention of their father and husband, respectively.

86. Mr. Juan F. Hernández Torres's physical and emotional damages, including his physical and mental pain and suffering prior to his death, caused by codefendants' negligence, are valued at a sum of no less than $200,000.00.

87. As the sole heirs of Mr. Juan F. Hernández Torres, Plaintiffs Mr. Juan A. Hernández Sánchez, Mrs. Yanira Hernández Sánchez, Mrs. Jennifer Hernández Sánchez and Mrs. Migna L. Sánchez García claim, on behalf of the community of heirs, the physical and emotional damages suffered by their father and husband, respectively.

88. Plaintiffs, Mr. Juan A. Hernández Sánchez, Mrs. Yanira Hernández Sánchez, Mrs. Jennifer Hernández Sánchez and Mrs. Migna L. Sánchez García, have individually suffered, and will continue to suffer, grave emotional damages and mental anguish due to the unnecessary and premature loss of their father and husband, respectively. Said damages are valued at a sum of no less than $400,000.00, for each.

89. Codefendants and their respective insurance companies are joint and severally liable to Plaintiffs for the negligent omissions and damages described in the present complaint.

## COUNT I
### (EMTALA- 42 U.S.C.A §1395dd)

90. Paragraphs 1 through 89 of this Complaint are incorporated by reference, as if fully set forth herein.

91. Defendant Hospital San Cristóbal, alternatively, Unknown Corporation "A", d/b/a Hospital San Cristóbal, failed to comply with EMTALA's screening and

stabilization and transfer provisions.

92. Hospital San Cristóbal directly contributed to Mr. Juan F. Hernández Torres's death by violating EMTALA's medical screening and stabilization and transfer provisions when attending Mr. Hernández Torres at its *Emergency Room* on January 1, 2021. As a direct result of Hospital San Cristóbal's EMTALA violations Plaintiffs have suffered irreparable personal harm. The clear language of the EMTALA liability provision affords any individual who suffers personal harm as a direct result of a hospital's violation of an EMTALA requirement, the right to claim damages in federal court against the incompliant hospital.

93. Based on all of the above, herein Plaintiffs, Mr. Juan A. Hernández Sánchez, Mrs. Yanira Hernández Sánchez, Mrs. Jennifer Hernández Sánchez and Mrs. Migna L. Sánchez García, assert their statutory right to institute a federal civil action under the EMTALA liability provisions against Hospital San Cristóbal to obtain compensation for those damages available for personal injury under Puerto Rico substantive law.

## COUNT II

### (Medical Malpractice, Vicarious Liability, Punitive Damages – 31 L.P.R.A. §§ 10801, 10803, 10805 and 10806)

94. Paragraphs 1 through 93 of this Complaint are incorporated by reference as if fully set forth herein.

95. Codefendants Hospital San Cristóbal, alternatively, Unknown Corporation "A", d/b/a Hospital San Cristóbal, Dr. José A. Cebollero, and John Doe 1, 2 and 3, had a duty to provide medical care to Mr. Juan F. Hernández Torres that complied with the applicable standards of the medical profession. Notwithstanding, Hospital San Cristóbal, Dr. José A. Cebollero, and John Doe Defendants 1, 2 and 3, breached that duty as set forth

above, and in doing so demonstrated grave disdain towards the life of patient Mr. Hernández Torres.

96. Hospital San Cristóbal, is further vicariously liable for the negligent acts and/or omissions incurred by its medical and nursing staff that intervened with Mr. Hernández Torres, as well as for its own negligence in the selection, monitoring, supervision and granting of privileges, to said physicians and nurses.

97. There is a clear and direct causal link between the medical malpractice and/or negligence of Hospital San Cristóbal, Dr. José A. Cebollero, and John Doe Defendants 1, 2 and 3, and the damages sustained by Plaintiffs, as set forth above.

## COUNT III

### (Direct Action Against Insurers - 26 L.P.R.A. ' 2003)

98. Paragraphs 1 through 97 of this Complaint are incorporated by reference as if fully set forth herein.

99. Defendants Unknown Insurance Companies A through E have a contractual obligation to compensate those who are damaged by the medical errors and omissions of defendants Hospital San Cristóbal, Dr. José A. Cebollero, and John Doe Defendants 1, 2 and 3. As set forth above, codefendants id in medical malpractice and/or negligence with respect to Mr. Hernández Torres. Moreover, there is a clear and direct causal link between their misconduct and the damages sustained by Plaintiffs, as set forth above.

100. Under 26 L.P.R.A. § 2003, Plaintiff have a right to reclaim directly against the corresponding insurers of defendants Hospital San Cristóbal, Dr. José A. Cebollero, John Doe Defendants 1, 2 and 3.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully requests that the Court enter final judgment against Defendants:

1. Declaring Defendant Hospital San Cristóbal, alternatively, Unknown Corporation "A", d/b/a Hospital San Cristóbal, to be in violation of 42 U.S.C.A. § 1395dd, as alleged hereinabove.

2. Declaring Defendants to be in violation of 32 L.P.R.A. §§ 10801, 10805 and 26 L.P.R.A. § 2003, as alleged hereinabove.

3. Finding Defendants jointly and severally liable to Plaintiffs for the non-economic damages sustained by Plaintiffs, in an amount not less than $400,000.00, for Mr. Juan A. Hernández Sánchez, Mrs. Yanira Hernández Sánchez, Mrs. Jennifer Hernández Sánchez and Mrs. Migna L. Sánchez García, each; and in an amount not less than $200,000.00, for Plaintiffs' inherited cause of action, plus applicable interest and costs.

4. Awarding Plaintiffs such other and further relief at law or in equity as this Court may deem just and proper, including punitive damages.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury of all issues triable of right by a jury in the complaint set forth above.

In San Juan, Puerto Rico, this 30th day of December 2022.

**RESPECTFULLY SUBMITTED.**

/s/Hatuey Infante Castellanos
USDC-PR 225713
hatueyinfante@gmail.com
**HATUEY INFANTE LAW OFFICES, P.S.C.**
Attorneys for Plaintiffs
P.O. Box 12014
San Juan, PR 00914
Tel: (787) 399-2238
Fax:(787) 641-5016