IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

JUAN HERNÁNDEZ-SÁNCHEZ, *et al.*,

   **Plaintiffs,**

       v.

HOSPITAL SAN CRISTOBAL, *et al.*,

   **Defendants.**

CIVIL NO. 22-1656 (JAG)

## MEMORANDUM AND ORDER

GARCIA-GREGORY, D.J.

Co-Defendants Quality Health Services of Puerto Rico, Inc. d/b/a Hospital San Cristóbal and Dr. José A. Cebollero Marcucci have filed Motions *in Limine* seeking to exclude Plaintiffs' expert witness Dr. Edwin Miranda Aponte ("Dr. Miranda"). Docket Nos. 97; 101.[1] For the reasons stated below, the Court **GRANTS** Defendants' Motions *in Limine*.

Federal Rule of Civil Procedure 702 states

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

---

[1] Third-Party Defendant, Dr. José Ariel Torres Ramírez, joined the request. Docket No. 108.

CIVIL NO. 22-1656 (JAG)                                                                 2

Fed. R. Civ. P. 702. While the Court agrees with Plaintiffs that an expert need not be a specialist in a particular medical discipline to provide expert testimony relating to that discipline, this is not the only factor to consider when determining if a witness is qualified to serve as an expert. *See Gaydar v. Sociedad Instituto Gineco Quirúrgico y Planificación*, 345 F.3d 15, 24-25 (1st Cir. 2003). Defendants argue that exclusion is warranted because Dr. Miranda (1) specialized in emergency medicine and has no other specialty; (2) has never held admitting privileges at any hospital; (3) does not have a medical license since 2019; (4) has not completed any continuing medical education since 2016 or 2017; (5) estimates that 90% of his professional practice involved administrative work; (6) has been excluded as an expert in two other cases; (7) failed to comply with the requirements of Fed. R. Civ. P. 26(a)(2)(B); and (8) failed to comply with the standards established in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), and their progeny. Docket No. 97. The Court agrees.

## I.    Dr. Miranda's Qualifications

This Court previously qualified Dr. Miranda as an expert in *Cartagena-Nieves v. Mennonite Gen. Hosp.*, Civ. No. 23-1126(JAG). *See* Docket No. 112 at 19. In *Cartagena*, however, the Court was not aware that Dr. Miranda never held admitting privileges at any hospital, had not completed any continuing medical education since 2016 or 2017, and estimated that 90% of his professional practice involved administrative work. Moreover, in *Cartagena*, the Court found that Dr. Miranda's expert report and deposition testimony provided medical literature relating to the national standard of care, and that he did not cherry-pick or ignore important evidence. Civ. No. 23-1126, Docket No. 174. For that reason, the Court held that the issues highlighted by Defendant went to the probative value of Dr. Miranda's testimony, not its admissibility. *Id.* Furthermore, the issues

CIVIL NO. 22-1656 (JAG)                                                                                    3

in this case are distinguishable from *Cartagena*. Here, Plaintiffs' EMTALA and medical malpractice

claims involve an alleged delay in the provision of medical services and surgery, while the claims

in *Cartagena* related to general emergency medicine, which had been his specialty.

When this Court qualified Dr. Miranda in *Cartagena*, it was under the impression that he

participated in continuing medical education courses but did not receive the accompanying

certification. Civil No. 23-1126, Docket No. 154-3 at 12-13.[2] Nevertheless, Defendants have brought

forth testimony in which Dr. Miranda admits he has not taken certified or uncertified continuing

education courses, but instead does his "medical education on [his] own."[3] *See* Docket No. 97-3 at

---

[2] During Dr. Miranda's deposition in the *Cartagena* case, he testified as follows:

> Q. And again, from previous depositions, I believe that you have not taken continued legal medical education since around twenty sixteen (2016). Correct?
> ATTY. JEFFREY M. WILLIAMS: Objection to form.
> THE DEPONENT – DR. EDWIN MIRANDA APONTE:
> A. Not certified, but I study medicine almost every day.
> BY ATTY. MELISSA FIGUEROA DEL VALLE:
> Q. Okay. I'm talking about official continuing medical education. You have not taken those since when?
> A. Yes, my answer was not certified medical education.
> Q. Since when have you not taken certified medical education?
> A. I guess the last was on two thousand sixteen (2016) or seventeen (17).

Civ. No. 23-1126(JAG), Docket No. 154-3 at 12-13.

[3] During the jury trial in *Morales-Cruz v. Hosp. Menonita Caguas, et al.*, Civ. No. 20-1358(CVR), Dr. Miranda testified:

> Q Now, if I recall your answer correctly, you said that you would have to submit compliance with the credits, correct?
> A Correct.
> Q Okay. But the question is have you taken them.
> A No.
> Q So that means that since 2019, you have not taken 120 credit hours that are required for doctors to be up to date for them to legally exercise the profession of medicine in Puerto Rico; is that correct?
> A Not certified.
> Q But you just said you have not taken them.
> A No. I do medical education on my own, not certified or for credits.

CIVIL NO. 22-1656 (JAG)                                                                    4

17-18. Dr. Miranda admits that he has not followed the continuing medical education curriculum established by the Puerto Rico Department of Health, which requires doctors to take 60 credit hours of continuing medical education every three years. *Id.* And he provides no information as to what he means when he says he "stud[ies] medicine almost every day." Civ. No. 23-1126(JAG), Docket No. 154-3 at 12-13. The Court, thus, cannot ascertain how many hours Dr. Miranda dedicates to his studies, whether he attends conferences or seminars, whether he reads articles from reputable journals, whether he takes courses, etc. Without this information, the record provides no evidence that Dr. Miranda's medical knowledge is up to date with current medical practices. Consequently, the Court cannot find that the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine an issue of fact.

The Court, thus, cannot find that Dr. Miranda's conclusions rest on a reliable foundation because Dr. Miranda (1) currently has no medical license, (2) has not taken any continuing education in 10 years, (3) his current continuing medical education is unknown, (4) has never admitted any patients to a hospital, (5) has no training in surgery or internal medicine, (6) has never performed a surgery like the one at issue in this case, (7) has never decided if surgery was necessary or not, (8) has never decided when a patient should be operated, and (9) most of his experience is in administrative work. *See* Docket No. 97; *see also Cruz-Vazquez v. Mennonite Gen. Hosp.*, 613 F.3d 54, 57 (1st Cir. 2010) ("Generally, if an expert has scientific, technical, [and] other

---

Q So on your own, it doesn't mean that you follow the curriculum that the health department, for example, establishes.
A No.

Docket No. 97-3 at 17-18; *see also* Civ. No. 20-1358(CVR), Docket No. 216.

**CIVIL NO.** 22-1656 (JAG)                                                             5

specialized knowledge that will assist the trier better to understand a fact in issue, and that

knowledge rests on a reliable foundation, that testimony must be admitted.") (cleaned up)

(citations omitted); *Pages-Ramirez v. Ramirez-Gonzalez*, 605 F.3d 109, 115-16 (1st Cir. 2010) ("The

dispositive question is not whether an expert is board certified in a particular medical specialty.

Rather, the Rules of Evidence require that the judge admit expert testimony relevant to the

disposition of the case when it will assist the trier of fact in understanding a fact in issue and rests

on a reliable foundation.").

## II.    Reliability of Principles and Methods

The Court also finds that Dr. Miranda's expert report is deficient, conclusory, and even

contradicting at times. The report is limited to explaining medical terminology, speculating about

what he would have done differently to prevent the patient's demise but without providing any

basis for his conclusions since he does not cite any medical literature to establish the applicable

standard of care. This is insufficient to properly assist the jury to determine whether Defendants

committed an EMTALA violation and/or medical negligence.

Dr. Miranda's medical malpractice analysis fails to establish the applicable standard of

care. Here, Dr. Miranda's report does not discuss

> duties or standards of care. Rather, he testified as to what he would
> have done differently in managing the decedent's case. Medicine,
> however, is not an exact science. It is, therefore, insufficient for a
> plaintiff in a malpractice case merely to show that another doctor
> would have chosen to treat the patient in a manner different from
> the manner in which the attending physicians treated him.

*Rolon-Alvarado v. San Juan*, 1 F.3d 74, 78 (1st Cir. 1993) (citations omitted). Furthermore, "the Puerto

Rico Supreme Court has held that even an acknowledged error in medical judgment cannot

support a malpractice claim so long as the mistake is reasonable." *Id.* (citations omitted).

CIVIL NO. 22-1656 (JAG)                                                                6

Dr. Miranda's analysis of the medical malpractice claim focuses on how he would have triaged and treated the patient differently—by performing surgery a day earlier—but fails to reference any medical literature supporting his conclusion that Defendants' management of the patient deviated from the applicable standard of care "by which decisions on the timing of such operations might be held to fall outside the range of reasonable judgments." *Id.* at 78. In *Rolon-Alvarado*, which involved a situation similar to the one before this Court, the First Circuit found

> As to the one-day delay in operating, [plaintiff's expert] made it clear that he would have put [the patient] under the knife on May 6 rather than waiting until May 7—but he offered no enlightenment on the subject of the prevailing standard by which decisions on the timing of such operations might be held to fall outside the range of reasonable judgments. By like token, while [plaintiff's expert] testified that he disagreed with the mid-stream change in diagnosis, and the way in which the hospital monitored the patient postoperatively, he failed to advance any basis on which applicable standards could be fixed or, conversely, against which defendant's conduct could be measured. The mere fact that [plaintiff's expert] might have selected a particular approach or method of treatment does not, without more, establish that a different approach or method, even if unsuccessful, fell short of the duty owed. Nor did the witness's references to generalities contained in a learned treatise bridge the gap.

*Id*. Since Dr. Miranda's report fails to establish the applicable standard of care—and consequently, fails to establish a deviation from that standard—the report is conclusory and, thus, insufficient to support the medical negligence claim because it does not rest on reliable principles and methods.

Additionally, in his deposition, Dr. Miranda explained that the timing of a surgery depended on "the criteria of the surgeon, along with the availability of the resources to do it" because the surgery also depends on, for example, the availability of an operating room and an anesthesiologist. Docket No. 97-2 at 55. Nevertheless, Dr. Miranda's report concludes that

CIVIL NO. 22-1656 (JAG)                                                                  7

"[t]here were no excuses to [not] come and do the surgery on January 1, 2021, before midnight"

but fails to discuss whether the necessary resources to perform the surgery, such as an operating

room and an anesthesiologist, were available on January 1, 2021. Docket No. 101-1 at 28.  As such,

Plaintiff has not shown that Dr. Miranda's conclusions are based on reliable principles and

methods.

 III.    Reliable Application of Principles and Methods to Facts of the case

As to the EMTALA claims, Dr. Miranda's report is conclusory and contradictory. On one

hand, his report claims that the patient (1) had "normal vital signs"; (2) "arrived peaceful, alert and

oriented"; (3) "was stable upon arrival to the hospital"; (4) "was [stable enough] to undergo

prompt[ly] surgery which can save his life"; (5) "arrived at San Cristobal Hospital with normal

blood pressure (126/65 mmHg), normal heart rate (98/min), and normal pulse pressure (61

mmHg)"; and (6) was "hemodynamically stable, and ready for surgery." Docket No. 101-1 at 2, 16,

26, 29. On the other hand, Dr. Miranda opines that (1) "the surgeon was obliged to come to the

hospital in a timely fashion to provide stabilization for Mr. Hernandez's disease," (2) "Dr. Lillo

and Dr. Torres failed to stabilize an[] emergency condition and Dr. Cebollero failed to come to the

hospital in a timely fashion to provide the definitive stabilization of an emergency surgical

condition," and (3) "Dr. Torres also failed to stabilize and prepare the patient for surgery." *Id.* at

19, 21, 27. These statements are mutually exclusive; it cannot be true both that the patient was

stable when he arrived at the hospital and that Defendants failed to stabilize him. This supports

the conclusion that Dr. Miranda's expert report and testimony are unreliable and will not assist

the jury at trial.

Dr. Miranda's discussion of the EMTALA claims actually hurts Plaintiffs' case. Dr.

Miranda states that the patient was stable and received medical attention. *See* Docket 101-1 at 16-

CIVIL NO. 22-1656 (JAG)                                                                     8

23, 25-29. This is all that is required under EMTALA. "EMTALA does not create a cause of action

for medical malpractice, and faulty screening . . . does not contravene the statute." *Del Carmen*

*Guadalupe v. Negron Agosto*, 299 F.3d 15, 21 (1st Cir. 2002) (cleaned up). "Congress enacted EMTALA

in 1996 in response to claims that hospital emergency rooms were refusing to treat patients with

emergency conditions but no medical insurance. EMTALA therefore is a limited anti-dumping

statute, not a federal malpractice statute. It creates private rights of action where hospitals violate

its mandates." *Ramos-Cruz v. Centro Médico Del Turabo*, 642 F.3d 17, 18 (1st Cir. 2011) (citations

omitted).

### A. Duty to Appropriately Screen

EMTALA imposes a duty to triage, which "takes the form of a requirement that a covered

hospital perform an 'appropriate medical screening examination' on 'any individual' who 'comes

to the emergency department' seeking examination or treatment." *Lopez-Soto v. Hawayek*, 175 F.3d

170, 172-73 (1st Cir. 1999) (quoting 42 U.S.C. § 1395dd(a)). "A hospital fulfills its statutory duty to

screen patients in its emergency room if it provides for a screening examination reasonably

calculated to identify critical medical conditions that may be afflicting symptomatic patients and

provides that level of screening uniformly to all those who present substantially similar

complaints." *Correa v. Hosp. San Francisco*, 69 F.3d 1184, 1192 (1st Cir 1995) (citations omitted). Dr.

Miranda's expert report explains the steps taken to triage the patient, the diagnosis reached, and

the treatment conducted. *See* Docket No. 101-1.[4] Thus, Dr. Miranda's own report shows that the

---

[4] The expert report states in pertinent part:

> [T]he Triage nurse [] recorded normal vital signs and the chief complain
> was abdominal pain [and] [t]he past medical history was recorded as
> diabetes mellitus . . . . the emergency physician Dr. Lillo Perez, ordered

CIVIL NO. 22-1656 (JAG)                                                      9

goal of 42 U.S.C. § 1395dd(a) was satisfied, which contradicts his conclusion that Defendant's

violated EMTALA by failing to properly screen, diagnose, or treat the patient. *See Reynolds v.*

*MaineGeneral Health*, 218 F.3d 78, 83 (1st Cir. 2000) ("The fact that [the patient] was in the hospital

---

laboratory tests and a CT scan of the abdomen and pelvis without contrast. He also ordered morphine and the patient was placed in observation . . . Dr. Lillo Perez[] recorded the history of present illness as 68- year-old male, status post PEG placement, who was brought today to the emergency department with generalized abdominal pain associated to distension and vomiting. The pertinent physical examination findings were abdominal tenderness and distension. At 4:51 p.m., the emergency physician, Dr. Jose Torres Ramirez, ordered more morphine for the pain, which was administered [and] recorded a progress note indicating that Mr. Hernandez's case was consulted to the radiologist and the surgeon on duty because of a possible intestinal perforation. Both coincided to perform another CT scan with water solution contrast . . . . At 9:46 p.m., Dr. Torres Ramirez recorded an admission and disposition note, indicating that the case was presented to the surgeon, Dr. Jose A. Cebollero Marcucci, who provided the medical orders for admission. The admission diagnosis was perforated hollow viscus. Dr. Torres Ramirez transcribed the laboratory test results and the image studies interpretations . . . [and] ordered NPO (nothing by mouth), IV fluids Ringer's lactate at a rate of 60 ml/hour and the antibiotic Zosyn®. He also ordered to schedule Mr. Hernandez to the operating room and to obtain the surgery permission . . . .

[On January 2, 2021,] [a]t 9:10 a.m., Dr. Cebollero ordered to hold surgery, IV fluids Ringer's lactate at a rate of 150 ml/hour, internal medicine consultation, and place the gastrostomy tube to gravity for drainage. At 1:28 p.m., the intern physician ordered arterial blood gases, an electrocardiogram, insulin, to discontinue Ringer's lactate and infuse 2,000 ml of NSS, then continue the same IV fluids at a rate of 125 ml/hour, strict intake and output chart, and sodium bicarbonate IV . . . .

At 2:45 p.m., the general anesthesia was induced, and the operation began at 3:45 p.m. Dr. Cebollero performed an exploratory laparotomy and found an intrabdominal abscess, necrotizing infection of the abdominal wall and peritonitis." He did a colostomy, appendectomy, gastrostomy, removed the previous PEG, did a debridement of the abdominal wall, and obtained a biopsy of the liver. He washed the peritoneal cavity and left a Jackson-Pratt drainage.

Docket No. 101-1 at 2-5.

CIVIL NO. 22-1656 (JAG)                                                           10

receiving treatment is a *prima facie* showing that the purpose of subsection (a) was satisfied; any failures of diagnosis or treatment were then remediable under state medical malpractice law.").

### B.  Duty to Stabilize

"As a corollary to the right to be appropriately screened, EMTALA guarantees patients the right, if an emergency medical condition is determined to exist, to have that condition stabilized before discharge or transfer to another hospital." *Reynolds*, 218 F.3d at 84. Dr. Miranda's expert report is also conclusory and contradictory as to this stabilization requirement. As explained above, Dr. Miranda explains the patient (1) had "normal vital signs"; (2) "arrived peaceful, alert and oriented"; (3) "was stable upon arrival to the hospital"; (4) "was [stable enough] to undergo prompt surgery which can save his life;" and (5) "Mr. Hernandez arrived at San Cristobal Hospital with normal blood pressure (126/65 mmHg), normal heart rate (98/min), and normal pulse pressure (61 mmHg)"; and (6) was "hemodynamically stable, and ready for surgery." Docket No. 101-1 at 2, 16, 26, 29. Consequently, Dr. Miranda's own report shows that the hospital did not breach its duty to stabilize because the patient was stable when he arrived and no emergency condition was identified. *Lopez-Soto*, 175 F.3d at 172 ("Only [in the event that a person goes to a covered hospital's emergency department for assistance] must the hospital provide an appropriate medical screening; and, only if that screening uncovers an emergency medical condition must the hospital stabilize the patient and refrain from transferring him except in compliance with the statutory commands.") (citations omitted); *Estate of Rivera v. Doctor Susoni Hosp., Inc.*, 288 F. Supp. 2d 161, 165 (D.P.R. 2003) ("The duty to stabilize is activated only if the hospital uncovers an emergency medical condition.") (citations omitted).

**CIVIL NO.** 22-1656 (JAG)                                                                 11

Even assuming *arguendo* that the hospital did uncover an emergency medical condition, Dr. Miranda's report still does not support Plaintiffs' EMTALA stabilization claim. Dr. Miranda's report argues that "Dr. Lillo and Dr. Torres failed to stabilize an[] emergency condition and Dr. Cebollero failed to come to the hospital in a timely fashion to provide the definitive stabilization of an emergency surgical condition." Docket No. 101-1 at 21. However, "delayed medical care, or even improper medical care, is not actionable under EMTALA." *Cintrón v. Hosp. Comunitario El Buen Samaritano, Inc.*, 597 F. Supp. 3d 515, 533 (D.P.R. 2022) (citation omitted); *see also Torres Otero v. Hosp. Gen. Menonita, Inc.*, 115 F. Supp. 2d 253, 260 (D.P.R. 2000) ("Plaintiffs allege that the treatment provided was incorrect and/or delayed . . . [t]he Court finds that Plaintiffs are attempting to engraft an EMTALA failure to stabilize claim upon a medical malpractice claim. EMTALA expressly defines the nature of the duty to stabilize in terms of the transfer or discharge of a patient; this Plaintiffs blithely ignore.").

Moreover, Dr. Miranda's report also acknowledges that the patient was never discharged or transferred to another hospital. "The duty to stabilize . . . applies only in the context of patients who are discharged or transferred to another hospital." *Estate of Rivera*, 288 F. Supp. 2d at 165 (citations omitted); *see also Alvarez-Torres v. Ryder Mem. Hosp., Inc.*, 582 F.3d 47, 52 (finding that the hospital "did not violate the stabilization provision because [the patient] was never transferred. The statute defines 'transfer' as 'the movement (including the discharge) of an individual outside a hospital's facilities at the direction of any person employed by (or affiliated or associated, directly or indirectly, with) the hospital.'") (quoting 42 U.S.C. § 1395dd(e)(4)). Therefore, the duty to stabilize was not triggered under EMTALA.

CIVIL NO. 22-1656 (JAG)                                                                12

The Court finds that Dr. Miranda's unsupported conclusions and contradictions render his expert report unreliable and would confuse the jury instead of assisting them in understanding the facts and evidence of this case. The caselaw is clear:

> [T]o be admissible under Rule 702, an expert's opinion must be supported by appropriate validation and rest on more than subjective belief or unsupported speculation. Thus, in assessing whether the expert opinion has the requisite validation for purposes of Rule 702, a court may conclude that it does not because, given the record at hand, there is simply too great an analytical gap between the data and the opinion proffered.

*Rodriguez v. Hosp. San Cristobal, Inc.*, 91 F.4th 59, 70-71 (1st Cir. 2024) (cleaned up). This Court "is well-justified in striking opinion testimony that depends upon the *ipse dixit* of the expert or that evinces significant analytical gap[s] between the data and the opinion proffered." *Doucette v. Jacobs*, 106 F.4th 156, 169 (1st Cir. 2024) (cleaned up). "Thus, an expert's failure to . . . explain [a] conclusory finding by reference to the facts at hand or by connecting those facts to relevant insights drawn from the expert's applied methodology or the academic literature" "can be grounds for a district court's exclusion of the proffered testimony." *Id.* (cleaned up); *see Guile v. United States*, 422 F.3d 221, 227 (5th Cir. 2005) ("The contradictions coupled with the lack of support for the statements take them out of the realm of substantive evidence. In the context of admissibility of expert testimony, this court has noted that if an opinion is fundamentally unsupported, then it offers no expert assistance to the jury.") (cleaned up).

## CONCLUSION

Pursuant to this Memorandum and Order, Defendants Motions *in Limine* are hereby GRANTED.

**CIVIL NO.** 22-1656 (JAG)                                                                13

IT IS SO ORDERED.

In San Juan, Puerto Rico, this Wednesday, March 18, 2026.


                                                          s/ Jay A. Garcia-Gregory
                                                          JAY A. GARCIA-GREGORY
                                                          United States District Judge